UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARJORIE VENERA
TOINS,

              Plaintiff,                          Civil Action No. 13-CV-14801

vs.

                                            HON. MARK A. GOLDSMITH

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.

_____/

## OPINION AND ORDER (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 11) and (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 20)

### I.    INTRODUCTION

This is a Social Security case.  Plaintiff Marjorie Toins appeals from the final determination of the Commissioner of Social Security, denying her application for disability benefits under the Social Security Act, 42 U.S.C. § 1381(a), et seq.  Plaintiff asserts that the conditions limiting her ability to work are her asthma and her back pain.  Administrative Record ("A.R.") at 16, 29, 203 (Dkt. 9).  On August 8, 2012, Administrative Law Judge ("ALJ") Andrew G. Sloss issued a decision that Plaintiff was not disabled from June 15, 2011 through the date of the decision.  Id. at 11.  Plaintiff requested a review of this decision, id. at 6, and the Appeals Council denied this request, id. at 1.  At that point, the ALJ's decision became the final decision of the Commissioner.  Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 543-544 (6th Cir. 2004).  Plaintiff then filed a complaint in this Court to contest the ALJ's decision (Dkt. 1).  The

parties have filed cross motions for summary judgment (Dkts. 11, 20).[1]  Because the Court concludes that the ALJ applied the proper legal standards in reaching his conclusion, and that the ALJ's conclusion is supported by substantial evidence in the record, the Court denies Plaintiff's motion for summary judgment (Dkt. 11) and grants Defendant's motion for summary judgment (Dkt. 20).

## II.   BACKGROUND

### A.  Testimony and Statements

Born in 1963, Plaintiff has the equivalent of a high school education, and has previously worked as a childcare worker, a cashier, a pickle line worker, and a machine operator.  A.R. at 12.  Plaintiff indicated that she stopped working in August 2006 because of her present conditions, id. at 203, and claims disability commencing on June 15, 2011, id. at 12.  At a hearing before the ALJ, conducted on July 16, 2012, Plaintiff testified that she was unable to work because of her back pain and her asthma.  Id. at 29.  Plaintiff testified that she suffered from no additional ailments that were severe enough to prevent her from working.  Id. at 31.

Plaintiff indicated that she had been diagnosed with rheumatoid arthritis in her back and left hip.  Id. at 34-35.  Plaintiff testified that her back pain is always present, but that it varies in severity and has been getting progressively worse in recent years.  Id. at 30.  At the hearing, Plaintiff rated her average pain as a seven, on a scale of one to ten.  Id. at 35.  Plaintiff also testified that she had been receiving injections to alleviate her pain for about two years and had not had any surgery.  Id. at 30, 35-36.  Generally, the injections "help for a little while."  Id. at 30.  Plaintiff also indicated that she takes Vicodin 750, Flexeril, and Indocin to relieve her pain,

---

[1] Although this case was originally referred to Magistrate Judge Mark A. Randon, see Notice of Referral (Dkt. 2), the Court subsequently entered an Order withdrawing the reference to the Magistrate Judge.  5/20/2014 Order (Dkt. 12).

id. at 30, but that those medications make her drowsy, id. at 34. Plaintiff stated that "[lying] flat helps," and that she typically lies down three to four times a day, for an hour or two at a time, due to her back pain and fatigue from the medications. Id. at 33-34. Plaintiff testified that on a bad day she spends most of the day in bed, and that she has about four "really bad days" a month. Id. at 35.

Plaintiff also testified that her ability to walk is limited by her asthma, as she becomes short of breath when walking certain distances. Id. at 29, 31. She uses an albuterol inhaler and a nebulizer to treat her asthma, in addition to taking daily medication. Id. at 31. In hot weather, Plaintiff stated that she will use her nebulizer multiple times a day. Id. According to Plaintiff, her breathing treatments make her "nervous" and "jittery," and she often lies down or sits on the couch after giving herself a breathing treatment. Id. at 34. Plaintiff testified that, in the past, her asthma was triggered by cleaning chemicals. Id. at 37-38.

Plaintiff further testified that she was prescribed Prozac after being diagnosed with bi-polar disorder, but that her doctor subsequently took her off of the Prozac because it caused her to lose her appetite. Id. at 31-32. Plaintiff did not believe that her psychological symptoms were severe, id. at 32, although she did testify to feeling depressed, id. at 36. Plaintiff also testified that she was hospitalized for chest pain, although it was long enough ago that she could not recall the exact date. Id. Plaintiff was not taking any medication for any arrhythmia, but was on medication for her blood pressure. Id.

Plaintiff indicated that she does not cook or do household chores, but that she does go shopping about once a month. Id. at 32. Plaintiff testified that she spends most of the day in her house because her medication makes her drowsy. Id. at 32-33. Plaintiff stated that she can walk approximately fifty feet before getting short of breath, and that she can lift about five pounds. Id.

at 33.  Plaintiff also referred to problems with her wrists and stated that she was unable to open a jar.  Id. at 37.  Plaintiff believed that she could not perform a job that required her to be present at a desk or a work-station for eight hours a day, five days a week, because she is unable to stand, and because, occasionally, even sitting will cause her pain.  Id. at 38.  Plaintiff also testified that she would not be able to make it through a day without her naps if she worked and took her medication.  Id.

In a function report, dated August 20, 2011, Plaintiff reported that she is "unable to walk, stand and sit for long period[s] of time," and that she spends most of the day watching television on the couch or lying in bed.  Id. at 221-222, 225.  Plaintiff stated that she is able to load a dishwasher, as well as vacuum.  Id. at 223.  Plaintiff also indicated that she goes outside every day to sit on her porch.  Id. at 224.  Plaintiff wrote that she does not drive because she feels light-headed and drowsy.  Id.

### B.  Medical Records

#### 1.  Treating Sources

##### a.  Asthma and shortness of breath

On June 8, 2011, Plaintiff saw Dr. Gregory Streff, D.O., a pulmonary specialist, requesting a re-check of her cough, shortness of breath, and asthma.  A.R. at 513.  Dr. Streff's examination of Plaintiff's chest and lungs showed quiet, even, and easy respiratory effort, with decreased lung sounds in both fields.  Id. at 514.  On June 30, 2011, Plaintiff was admitted to the hospital on complaints of shortness of breath.  Id. at 239.  Hospital records indicate that Plaintiff experienced a gradual onset of shortness of breath over approximately six days; Plaintiff reported that she had shortness of breath upon exertion, but not while resting, and denied having any chest pain.  Id. at 242.  Upon assessment, hospital medical staff observed that Plaintiff did not appear

to be in acute respiratory distress.  Id. at 243.  Hospital staff further observed that Plaintiff exhibited normal and non-labored respirations, normal respiratory effort, and no cough.  Id. at 243, 245.  Upon examination, the hospital noted that Plaintiff had bibasilar abnormalities and diminished breath sounds in both lungs.  Id. at 243.  Hospital records indicate that Plaintiff became "short of breath just walking across the room," and that she was "[u]nable to lie down flat and [was] clearly more comfortable sitting up."  Id. at 244.  Plaintiff was diagnosed with asthmatic bronchitis and acute bronchospasm.  Id. at 245.  It appears that Plaintiff was evaluated for pneumonia, but a chest x-ray showed no acute disease.  Id. at 254.

About a week later, on July 7, 2011, Plaintiff saw Dr. John Stoker, D.O., her primary care physician, for a follow-up appointment regarding an asthma attack.  Id. at 419.[2]  Plaintiff rated her pulmonary discomfort at a severity of three over a week's time.  Id.  Upon examination, Dr. Stoker reported that Plaintiff's chest was moving equally on both sides, with no retraction or stridor.  Id. at 421.  Dr. Stoker further observed wheezing and rhonchi in all lung fields.  Id.  The records from this visit indicate that Plaintiff had a history of pulmonary diagnoses, which included asthma, sarcoidosis, and restrictive lung disease.  Id. at 419-420.  During this visit, Dr. Stoker also diagnosed Plaintiff with chronic obstructive pulmonary disease ("COPD") and bronchitis with exacerbations.  Id. at 422.  The medical records from follow-up appointments with Dr. Stoker on August 4, 2011, id. at 263, and October 8, 2011 indicate that Dr. Stoker made similar observations of Plaintiff's respiratory condition at those visits, id. at 383 (noting also that breath sounds were well heard).

---

[2] In his medical report, Dr. Stoker wrote that "[Plaintiff] went to the ER on June 6, 2011 and [was] given nebulizer treatment."  A.R. at 419.  It is unclear whether this visit was a follow-up visit from Plaintiff's June 30, 2011 ER visit (and the report contains a typographical error), or if Plaintiff had also previously sought emergency treatment on June 6, 2011.

On December 14, 2011, Plaintiff saw Dr. Streff for a re-check for cough, shortness of breath, and asthma.  Id. at 510.  Dr. Streff found that Plaintiff had quiet, even, and easy respiratory effort, with decreased breath sounds in both fields.  Id. at 511.  Also on December 14, 2011, Plaintiff underwent an in-depth pulmonary function analysis, which showed results consistent with restrictive lung disease.  Id. at 504.  On December 20, 2011, Plaintiff saw a physician in Dr. Stoker's office,[3] complaining of shortness of breath with exertion and intermittent chest pains.  Id. at 400.  Plaintiff rated her discomfort as mild.  Id.  An examination revealed that Plaintiff's chest was moving equally on both sides, with no retraction or stridor; Plaintiff had good breath sounds, and no wheezing, rhonchi, or crackles were observed.  Id. at 401.  On December 23, 2011, Plaintiff returned to Dr. Stoker's office for a follow-up visit, complaining of shortness of breath upon exertion, cough, wheezing, and pain with breathing.  Id. at 395.[4]  An examination showed that Plaintiff's chest moved equally on both sides, with no retraction or stridor, but that intermittent rales were heard upon expiration.  Id. at 396.  The examining physician also observed rhonchi and wheezing in all lung fields, and noted that Plaintiff was short of breath upon exertion.  Id.  On May 30, 2012, Plaintiff was seen for a re-check of her asthma, and reported that she was not experiencing any shortness of breath or wheezing.  Id. at 451.[5]  An examination showed that Plaintiff's chest was moving equally on both sides and that Plaintiff had rhonchi and wheezing in all lung fields.  Id. at 452.

---

[3] Plaintiff returned to Valley Medical Center, which appears to be the office out of which Dr. Stoker practices.  However, the records from this visit indicate that Plaintiff saw Dr. Jane Johnson, M.D., not Dr. Stoker.  A.R. at 404.
[4] The records indicate that Dr. Johnson performed the exam.  Id. at 399.
[5] The records indicate that Dr. Michael T. Owczarzak, M.D., saw Plaintiff during this particular visit.  Id. at 454.

### b.  Back pain

On January 7, 2011, Plaintiff saw Dr. Stoker, complaining of lower and mid-back pain, muscle spasms, and pain radiating into Plaintiff's hips.  A.R. at 273-274.  Plaintiff estimated the severity of her pain at a two for about a week's time.  Id. at 273.  An examination revealed a decreased range of motion and muscle spasms in Plaintiff's lumbar spine.  Id. at 275.  Plaintiff's lower extremities presented with a normal range of motion and no pain or tenderness; Plaintiff had no difficulty walking or standing.  Id.  Plaintiff's muscle strength and tone appeared normal.  Id. at 275-276.  The records from this visit indicate that Plaintiff had a history of obesity, rheumatoid arthritis, and degenerative joint disease.  Id. at 273.  Plaintiff was advised to ice and rest the affected areas; she was also set up for physical therapy and prescribed Vicodin for her lumbar pain.  Id. at 276-277.  Plaintiff was also advised to increase her daily exercise and reduce her caloric intake in an effort to lose weight.  Id. at 277.

Plaintiff returned to Dr. Stoker on February 8, 2011, complaining of lower-back pain.  Id. at 284.  Plaintiff indicated that the pain had been ongoing for one month, and she ranked its severity at a two.  Id.  Plaintiff exhibited no difficulties walking or standing, and demonstrated no pain and a normal range of motion in her lower extremities.  Id. at 286-287.  An inspection of the lumbar spine showed a decreased range of motion and muscle spasms.  Id. at 286.  During this visit, Plaintiff was diagnosed with lumbar myositis and referred to Dr. James Culver, M.D., for pain management in the form of epidural injections.  Id. at 287-288.  Plaintiff was also advised to continue with the Vicodin, continue resting and icing the affected areas, to continue with home therapy, and to lose weight.  Id.

On February 15, 2011, Plaintiff saw Dr. Culver, complaining of low-back pain that radiated into her right leg.  Id. at 315.  Upon examination, Dr. Culver stated that Plaintiff was

able to walk unassisted and with no apparent limp, but he noted tendernesI s in the lumbar spine and right sciatic notch.  Id.  Plaintiff's lumbar mobility was reduced and movement appeared to exacerbate the pain.  Id.  Dr. Culver diagnosed Plaintiff with lumbar radiculitis, with right sciatica and low-back pain syndrome; he suspected a possible disc herniation.  Id.  On February 16 and February 25, Dr. Culver administered lumbar epidural injections and Plaintiff reported a 70% improvement.  Id. at 365.

On March 1, 2011, Plaintiff saw Dr. Stoker's office complaining of lower-back pain; the examination revealed only a decreased range of motion in the lumbar spine.  Id. at 278, 280. Plaintiff experienced no difficulty walking or standing.  Id. at 280.  In early March, Plaintiff completed her injections with Dr. Culver; she reported a 60% improvement in her symptoms and Dr. Culver anticipated even better results after the final procedure.  Id. at 306, 364.  On April 13, 2011, Plaintiff had a follow-up appointment with Dr. Stoker concerning her low-back pain, and she also complained of pain in her hips.  Id. at 289-290.  Plaintiff rated her pain severity at a three over two weeks.  Id. at 289.  As with prior appointments, Plaintiff had no difficulty walking or standing, and an examination revealed only the decreased range of motion and muscle spasms in the lumbar region.  Id. at 291.  The same examination showed no pain and a normal range of motion in her lower extremities.  Id. at 291-292.  During this visit, Plaintiff was diagnosed with degenerative disk disease of the lumbar spine.  Id. at 292.

On June 22, 2011, Plaintiff returned to Dr. Culver for injections to treat her lumbar radiculopathy and sciatica, complaining of low-back pain radiating into her left leg.  Id. at 333. Plaintiff was able to walk without assistance, but favored her left leg slightly.  Id.  Upon his examination, Dr. Culver observed tenderness in the lumbar spine and over the sciatic notches. Id.  Plaintiff received four rounds of injections in July and reported a 40% improvement at the

time of her last injection;[6] Dr. Culver expected further improvement following the final injection. Id. at 362.

On August 23, 2011, Plaintiff saw Dr. Stoker for a follow-up appointment regarding her low-back pain; she estimated her severity of pain at a two over two weeks. Id. at 386. Plaintiff had no difficulty walking or standing, and an examination demonstrated only a decreased range of motion and muscle spasms in the lumbar region. Id. at 388. On September 15, 2011, Plaintiff visited Dr. Stoker complaining of pain in her left hip and knee, and requesting to see an orthopedic specialist. Id. at 413. Plaintiff rated her pain at a three for one month. Id. On this visit, Dr. Stoker examined the range of motion for Plaintiff's left hip and ankle, and found no defects, tenderness, or dislocation. Id. at 416. Dr. Stoker also examined the range of motion for Plaintiff's left knee, and found tenderness in Plaintiff's patella, but no defects or dislocation. Id. There appeared to be no problems with Plaintiff's muscle strength or tone, and Plaintiff had no difficulty standing or walking. Id. at 415-416. X-rays were taken of Plaintiff's left hip and left knee; Dr. Stoker noted that they appeared normal, but that he was awaiting a radiology report. Id. at 418. Dr. Stoker also arranged for a referral to an orthopedic specialist. Id. at 417-418.

On October 8, 2011, Plaintiff followed-up with Dr. Stoker after seeing an orthopedic specialist. Id. at 382. Plaintiff complained of chronic, moderate pain, lasting about a week. Id. During this visit, Plaintiff had a reduced range of motion in her lumbar spine, but a normal range of motion, without pain, in her lower extremities. Id. at 383-384. Plaintiff was diagnosed with lumbago. Id. at 384. On October 20, 2011, Plaintiff complained of chronic back pain, estimating her pain at a three. Id. at 375. Plaintiff had no difficulty walking or standing; she exhibited normal range of motion, without pain, for all extremities, except for her left shoulder

---

[6] At Plaintiff's third injection, Dr. Culver noted that "for some unknown reason [Plaintiff's] symptoms greatly increased just in the last couple of days." A.R. at 362.

and lumbar spine.  Id. at 378-379.   On November 23, 2011, Plaintiff reported mild and reoccurring back pain.  Id. at 409.   At this time, Plaintiff also exhibited pain walking and standing, although an examination revealed only a decreased range of motion in the lumbar region. Id. at 410.

Dr. Stoker scheduled a lumbar CT regarding Plaintiff's "acute and chronic back pain despite steroid injections," and he also prescribed Vicodin.  Id. at 411.  On December 8, 2011, Plaintiff characterized her pain as continuous and mild.  Id. at 405.  She again exhibited pain while walking and standing, and an examination revealed only the decreased range of motion and tenderness to movement in her lumbar spine.  Id. at 406.  On December 30, 2011, Plaintiff complained of mild back pain, but exhibited no difficulty walking or standing.  Id. at 391-392. She was prescribed Vicodin and her Neruontin was increased.  Id. at 394.  On January 5, 2012, Plaintiff received her Lumbar CT results, which showed degenerative spurring on her third and fourth lumbar vertebrae.  Id. at 374.  Based on the CT results, Plaintiff's Neruontin dosage was increased.  Id. at 496.  On January 17, 2012, Plaintiff followed up with Dr. Stoker's office regarding her CT results, and characterized her back pain as continuous and moderate.  Id. at 491.  Plaintiff exhibited pain while walking and standing, and demonstrated a decreased range of motion and tenderness to movement in the lumbar spine.  Id. at 492-493.  Plaintiff was diagnosed with lumbar osteoarthritis.  Id. at 493.

On January 30, 2012, Plaintiff went for a follow-up appointment, complaining of reoccurring, mild back pain, and demonstrated pain with walking and standing.  Id. at 487-488. On February 8, 2012, Plaintiff continued to complain of mild pain in her left leg and hip, but had no difficulty walking or standing.  Id. at 482-483.  In addition to problems in her lumbar region, an exam also showed that Plaintiff suffered from a decreased range of motion and tenderness to

movement in her left hip.  Id. at 484.  On March 3, 2012, Plaintiff reported that she was in physical therapy, but still experiencing mild back pain.  Id. at 477.  Plaintiff exhibited difficulty walking and standing, but, upon examination, her lower extremities appeared to have a normal range of motion, without pain, and normal muscle strength and tone.  Id. at 478-479.  On March 22, 2012, Plaintiff presented with multiple joint pain — which she characterized as mild in nature — chest pain, and swelling and numbness in her extremities.  Id. at 472.  She was able to stand and walk without difficulty.  Id. at 474.  Plaintiff told Dr. Stoker that she believed these new symptoms were related to starting Neurontin; the treatment notes indicate that Plaintiff was told to "hold [the] Neurontin," and check-in after a month.  Id. at 472, 475.  On May 8, 2012, Plaintiff was examined for mild back pain that radiated into her left hip, and she demonstrated a decreased range of motion and tenderness in her left hip and her lumbar region.  Id. at 456-457, 458.  A second left-hip x-ray was ordered and Plaintiff arranged for further injections with Dr. Culver.  Id. at 460.

Plaintiff returned to Dr. Culver for pain management therapy on May 22, 2012.  Dr. Culver noted that Plaintiff was experiencing similar symptoms as those presented on her prior visits.  Id. at 507-508.  Upon Dr. Culver's examination, Plaintiff favored the left leg, but was able to walk without assistance.  Id. at 507-508.  According to Plaintiff, physical therapy was not effective at reducing her symptoms, and the injections provided relief for only a few months.  Id. at 507.  On May 30, 2012, Plaintiff reported mild, continuous back pain, id. at 450, but was able to walk and stand without problem, id. at 452.  On June 27, 2012, Plaintiff again reported mild and reoccurring pain in her left hip.  Id. at 444.  She exhibited a decreased range of motion and tenderness in her left hip, but was able to walk and stand without difficulty.  Id. at 446.  During

both of these visits, Plaintiff continued to exhibit the decreased range of motion and tenderness upon movement associated with her lumbar region.  Id. at 452, 446.

### c.  Other

Plaintiff also suffers from a wide variety of other complaints.  For example, her medical records include diagnoses such as diabetes mellitus, type II diabetes, peripheral vascular disease, hyperlipidemia, hypertension, elevated cholesterol, allergic rhinitis, cardiac arrhythmia, urinary incontinence, sleep apnea, gastroesophageal reflux disease, colitis, vertigo, carpal tunnel syndrome, depression, insomnia, anxiety, cardiomegaly, irritable bowel syndrome, neuropathy, and bi-polar depression.  A.R. at 273, 289-290, 384, 439-440, 470, 514-515.  The majority of Plaintiff's medical records before the Court speak to Plaintiff's complaints regarding her back pain and her asthma; however, Plaintiff has also sought treatment for incontinence, id. at 294, cholesterol, id. at 300, low blood pressure, id. at 267, 425, diabetes, id. at 436, stomach pain, id. at 425, 462, and insomnia, id. at 331, 431.  Plaintiff is also routinely referred to as a non-compliant patient.  See id. at 273, 395, 450.

### 2.  Non-Treating Sources

As part of the disability determination process conducted by the Disability Determination Service for Social Security Claims, Dr. Quan Nguyen, M.D., a state agency examiner, prepared a disability determination explanation, which included a physical residual functional capacity assessment of Plaintiff, dated August 31, 2011.  A.R. at 17; see also id. at 83-102.  Dr. Nguyen found that Plaintiff had the following severe impairments: (i) discogenic and degenerative back disorders; (ii) osteoarthrosis and allied disorders; (iii) fibromyalgia; (iv) asthma; (v) sarcoidosis; (vi) obesity; (vii) hypertensive vascular disease; (viii) diabetes mellitus; and (ix) sleep-related breathing disorders.  Id. at 87.  In his analysis, Dr. Nguyen indicated that Plaintiff's medically

determinable impairments could reasonably be expected to produce Plaintiff's alleged symptoms, but that her statements concerning the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence. Id. at 88. Dr. Nguyen found Plaintiff's statements to be "partially credible." Id. In assessing the credibility of Plaintiff's statements, Dr. Nguyen relied upon the following: (i) Plaintiff's self-reported activities of daily life; (ii) the location, duration, frequency, and intensity of Plaintiff's symptoms, including pain; (iii) precipitating and aggravating factors; (iv) Plaintiff's treatment regimen; and (v) other measures used to reduce or relieve Plaintiff's symptoms. Id. Specifically, Dr. Nguyen noted that Plaintiff was able to load the dishwasher, vacuum, cook simple meals, and shop. Id. at 89. Dr. Nguyen also explained that Plaintiff's medical records indicated that she could ambulate without any assistance and that she had no difficulty walking or standing, aside from a mild limp. Id. Dr. Nguyen further noted that the social security field officer who interviewed Plaintiff observed that Plaintiff demonstrated no problems walking, sitting, standing, using her hands, or breathing. Id. Therefore, Dr. Nguyen opined that Plaintiff's "statements about the functional restrictions placed by her impairments are not supported to the extent reported by [Plaintiff]." Id.[7]

In his residual functional capacity assessment, Dr. Nguyen suggested that Plaintiff was limited to occasionally lifting or carrying ten pounds, and could frequently lift or carry less than that. Id. Dr. Nguyen further indicated that Plaintiff could stand and/or walk for up to two hours with normal breaks, and that Plaintiff could sit for about six hours in an eight-hour day, with normal breaks. Id. Dr. Nguyen also indicated that Plaintiff could push or pull in an unlimited capacity; that Plaintiff could occasionally climb ramps/stairs, balance, kneel, crouch and crawl,

_____

[7] Dr. Nguyen referenced Plaintiff's statements that she is "only able to walk 50 [feet], climb 2 steps then rest, stand 10 [minutes], sit 20 [minutes,] [and] lift 5 [pounds]."  A.R. at 89.

but that Plaintiff could never climb ladders, ropes, or scaffolds, or stoop below the waist.  <u>Id.</u> at 89-90.  Dr. Nguyen also recommended that Plaintiff avoid concentrated exposure to extreme temperatures, wetness and humidity, fumes, and hazards.  <u>Id.</u> at 90.  Ultimately, Dr. Nguyen recommended that Plaintiff be limited to sedentary work, <u>id.</u> at 91, concluding that Plaintiff was not disabled, <u>id.</u> at 92.

### C. Vocational Expert

The vocational expert ("VE"), Judith Findora, testified at the hearing.  A.R. at 10, 39-42.  Ms. Findora stated that she was familiar with Plaintiff's past work experience.  <u>Id.</u> at 40.  The ALJ then posed the following hypothetical to the VE:

> I'd like you to assume a person of the claimant's age, education, and past work who's able to perform sedentary work as defined by the regulations.  She must be allowed to sit or stand alternatively at will provided that she is not off task more than 10 percent of the work period.  She can never climb ladders, ropes, or scaffolds, and can occasionally climb [ramps] or stairs; she can . . . occasionally balance, stoop, crouch, kneel, or crawl.  She must avoid concentrated exposure to extreme heat and cold, humidity, and fumes, odors, dust, and gases, she must also avoid concentrated exposure to hazards.

<u>Id.</u>  The VE testified that such a person would be unable to perform any of Plaintiff's previous work, but that the individual would be able to perform work as (i) an information clerk, with approximately 2,500 jobs in the regional economy; (ii) an administrative support worker, with approximately 3,800 jobs in the regional economy; and (iii) a ticket checker, with approximately 1,800 jobs in the regional economy.  <u>Id.</u> at 40-41.[8]

The ALJ also asked Ms. Findora whether someone who is "unable to engage in sustained work activity on a regular and continuous basis for eight hours a day . . . five days a week - - for a 40 hour work week," would be able to find competitive work.  <u>Id.</u> at 41.  The VE testified that

---

[8] Ms. Findora testified that she defined the "region" as the state of Michigan.  A.R. at 39.

such an individual would be precluded from work. Id. The ALJ also inquired whether any jobs would be able to accommodate Plaintiff's need "to lie down two to three times periodically throughout the day." Id. The VE testified that no jobs would be able to accommodate such a need if it was "in excess of the regular break schedule." Id.

### III.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court's review is limited to determining whether the Commissioner's decision "'is supported by substantial evidence and was made pursuant to proper legal standards.'" Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 512 (6th Cir. 2010) (quoting Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 604 (6th Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In determining whether substantial evidence exists, the Court may "look to any evidence in the record, regardless of whether it has been cited by [the ALJ]." Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 535 (6th Cir. 2001). "[T]he claimant bears the burden of producing sufficient evidence to show the existence of a disability." Watters v. Comm'r of Soc. Sec., 530 F. App'x 419, 425 (6th Cir. 2013).

"Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether an individual is disabled, the Commissioner applies the following five-step sequential disability analysis: (i) whether the claimant performed substantial gainful activity during the disability period; (ii) whether the claimant has a severe medically determinable impairment; (iii) whether the claimant has an

impairment that meets or equals a listed impairment; (iv) whether the claimant, in light of her residual functional capacity ("RFC") can return to her past relevant work; and (v) if not, whether the claimant, in light of her RFC and her age, education, and work experience, can make an adjustment to other work. See 20 C.F.R. § 416.920(a) (explaining the five-step sequential evaluation process). Plaintiff has the burden of proof for the first four steps, but, at step five, the burden shifts to the Commissioner to show that "notwithstanding the claimant's impairment, [s]he retains the residual functional capacity to perform specific jobs existing in the national economy." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).

## IV.   THE ALJ'S DECISION

The ALJ based his decision on an application of the Commissioner's five-step sequential disability analysis to Plaintiff's claim. The ALJ found as follows:

- Under Step One, Plaintiff met the insured status requirements through December 31, 2011, and Plaintiff had not engaged in any substantial gainful activity since June 15, 2011, the alleged onset date of disability. A.R. at 12-13.

- Under Step Two, Plaintiff had the following severe impairments: osteoarthrosis, unspecified; rheumatoid arthritis; asthma; sarcoidosis/restrictive lung disease; chronic obstructive pulmonary disease ("COPD"); and obesity. Id. at 13.

- Under Step Three, Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of a listed impairment. Id. at 15.

- Under Step Four, Plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the [Plaintiff] must be allowed to sit or stand alternatively at will, provided that she is not off-task for more than 10% of the work period. The [Plaintiff] can never climb ladders, ropes, or scaffolds. The [Plaintiff] can occasionally climb ramps or stairs. The [Plaintiff] can occasionally balance, stoop, crouch, or crawl. The [Plaintiff] must avoid concentrated exposure to heat, cold, humidity, fumes, odors, dusts, and gasses [sic]. The [Plaintiff] must also avoid concentrated exposure to hazards." Id. at 15. Given the RFC, Plaintiff was unable to perform past relevant work. Id. at 18.

- Under Step Five, Plaintiff had the age, education, work experience, and RFC to perform the following jobs that existed in significant numbers in the national economy: information clerk (unskilled/sedentary); administrative support worker (unskilled/sedentary); and ticket checker (unskilled/sedentary). Id. at 19.

## V.   ANALYSIS

As an initial matter, Plaintiff's brief is far from a model of clarity. Plaintiff's arguments are not well presented or organized. At the outset, Plaintiff states that she "does not dispute the functional capacity rating provided by the ALJ." Pl. Br. at 5 (Dkt. 11). Furthermore, "Plaintiff agrees that because she is less than fifty [years old] there would be some work available." Id. Therefore, under the five-step analysis, Plaintiff would appear to concede that she is not disabled. However, Plaintiff also appears to raise the following three challenges to the ALJ's decision: (i) the ALJ's decision was not supported by substantial evidence; (ii) the ALJ failed to properly apply the treating-physician rule; and (iii) the ALJ failed to "consider how the combination of [Plaintiff's] impairments affect the [Plaintiff's] ability to do basic work activities." Id. at 7. Even if Plaintiff did not concede that she was not disabled, the Court would reject Plaintiff's arguments and affirm the ALJ's decision, as it applied the correct legal standards and is supported by substantial evidence.

### A.  The ALJ's Decision is Supported by Substantial Evidence

Plaintiff argues that "considering her testimony and the medical evidence[,] a finding of disability should have been made." Pl. Br. at 5. Specifically, "Plaintiff submits [that] inadequate consideration was given by the ALJ as to the practical functional effects of having the severe breathing condition." Id. at 6.[9] The "practical functional effects" on which Plaintiff appears to

---

[9] The Court construes her breathing condition to lie at the heart of Plaintiff's argument that the ALJ's decision lacked substantial evidence, although the Court notes that this portion of Plaintiff's brief does contain a passing reference to Plaintiff's back pain. Pl. Br. at 6 ("[Plaintiff] testified that to relieve her back pain, which she described as sharp in severity, that she had to frequently lay [sic] down.").

rely primarily are her need for frequent rests, including multiple naps for more than an hour at a time, and her inability to walk without becoming short of breath. Id. at 6-7. Specifically, Plaintiff alleges that her medications make her drowsy, and that she must sit or lie down after her breathing treatments. Id. at 6. Plaintiff asserts that her functional limitations would prevent her from engaging in an eight-hour workday and that, according to the VE, this would preclude her from finding gainful work. Id. at 6-7.[10]

In response, Defendant argues that "the ALJ fully accommodated the limiting effects of Plaintiff's impairments by restricting Plaintiff to a significantly reduced range of sedentary work." Def. Br. at 9 (Dkt. 20). Defendant further argues that the ALJ incorporated a sit/stand-at-will option in the RFC as an additional limitation to Dr. Nguyen's recommendation, specifically "to accommodate Plaintiff's subjective testimony regarding her need to frequently rest." Id. Defendant also argues that the ALJ properly discounted Plaintiff's testimony about her need to lie down three to four times a day, because such symptoms were inconsistent with the objective medical findings contained in the record. Id. Defendant alleges that Plaintiff has provided no medical evidence to support such limitations, id. at 11, and offers no reason for the Court to question the ALJ's credibility determination, id. at 10. Finally, Defendant argues that because Plaintiff "does not dispute" the ALJ's RFC, Plaintiff concedes that there is substantial

---

[10] Plaintiff also objects to the ALJ's failure to reference her hospitalization for breathing difficulties, and her testimony regarding her "acute exacerbations of the asthma / restrictive lung disease." Pl. Br. at 5-6. However, in his decision, the ALJ explicitly noted that Plaintiff "sought emergency medical treatment on June 30, 2011, due to intermittent exertional shortness of breath." A.R. at 16. The ALJ went on to discuss the medical findings from that visit, including that Plaintiff "presented with normal and non-labored respiration and a normal respiratory effect." Id. And while Plaintiff fails to elaborate on what precise testimony the ALJ did not reference in his findings, the Court notes that the ALJ indicated that Plaintiff "stated that she sometimes has difficulty walking because of shortness of breath." Id. In any event, an ALJ is not required to reference every fact in the record in his findings. See Dykes ex rel. Brymer v. Barnhart, 112 F. App'x, 463, 467 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" (quoting Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000))).

evidence to support the ALJ's determination.  Id.  Defendant maintains that because the ALJ's hypothetical to the VE accurately incorporated the limitations set forth in the ALJ's RFC, the "ALJ could properly rely on the [VE's] testimony as substantial evidence in finding that Plaintiff was capable of performing jobs found in the national economy."  Id.

In making the RFC determination, the ALJ relied on (i) the opinion of the state agency examiner, Dr. Nguyen, that Plaintiff could perform sedentary work; (ii) Plaintiff's testimony regarding her need to take frequents rests in adding a further "sit/stand at will" option to Dr. Nguyen's assessment; (iii) Plaintiff's medical records in concluding that the only objective medical findings were "decreased range of motion and tenderness in the lumbar spine and shortness of breath upon exertion"; and (iv) his finding that Plaintiff's testimony was not fully credible because it was inconsistent with the objective medical findings.  A.R. at 18.

In support of her contention that the ALJ did not consider the functional limitations associated with her pulmonary problems, Plaintiff points to her testimony concerning her frequent need to lie down for hours at a time.  However, the transcript of Plaintiff's testimony indicates that her subjective need to lie down was largely associated with her back pain, not with her breathing condition.  Id. at 33-34.  Specifically, Plaintiff stated that "[lying] flat helps" to relieve the pain and that she would lie down "[t]hree or four times a day."  Id. at 33-34.  Plaintiff further testified that she would spend about four days a month lying in bed all day due to back pain.  Id. at 35.  While Plaintiff, in her brief, cites to these portions of the record, she does not connect her alleged need to nap or lie flat in bed multiple times a day to her breathing conditions.[11]

---

[11] Plaintiff does claim that she testified that "[a]fter she has given herself a breathing treatment she either sits on the couch or lays [sic] in bed."  Pl. Br. at 6.  At the hearing, when asked by counsel if Plaintiff felt "different or fatigued" after her breathing treatment, Plaintiff responded that she felt "nervous" or "jittery."  A.R. at 34.  Thus, there is no evidence to suggest that

As the ALJ noted, the objective medical findings indicate a shortness of breath only upon exertion, id. at 18, and a review of Plaintiff's medical records supports this finding.  See id. at 242, 244, 396, 400.   Upon examination, Plaintiff regularly exhibited quiet, even, and easy respiratory effort therefore appearing to be without respiratory distress while resting or sitting. See id. at 243, 245, 511.  The ALJ fully accommodated for Plaintiff's exertional limitations by restricting Plaintiff to sedentary work, with an option to sit at will.  There is no objective medical evidence to indicate that Plaintiff's pulmonary conditions are so severe as to render Plaintiff unable to sit for lengthy periods of time.   And while Plaintiff's numerous medical records reference several pulmonary diagnoses, a diagnosis, without more, does not speak to the severity of a condition.  See Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); see also Hill v. Comm'r of Soc. Sec., 560 F. App'x 547, 551 (6th Cir. 2014) ("[D]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it.").  Therefore, it was reasonable for the ALJ to conclude that Plaintiff's asthma, or other breathing conditions, did not prevent her from performing sedentary work.

Although not directly raised by Plaintiff, it was also reasonable for the ALJ to conclude that Plaintiff's back pain, in conjunction with Plaintiff's asthma, was not so functionally limiting as to preclude her from sedentary work.   In evaluating a claim of disability premised on subjective allegations of pain, the Sixth Circuit has explained that,

> there must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.   The

---

Plaintiff's breathing treatment makes her fatigued, nor has Plaintiff provided any explanation as to why sedentary work, with an option to sit or stand at will, would not accommodate her subjective need to sit down after a breathing treatment.

> standard does not require, however, objective evidence of the pain
> itself.

Duncan v. Sec'y of Health & Hum. Servs., 801 F.2d 847, 853 (6th Cir. 1986) (citations and quotation marks omitted); see also 20 C.F.R. § 404.1529(c) (setting forth guidelines for analyzing subjective claims of pain).

While Plaintiff testified that her back pain is sufficiently severe as to preclude her from sitting for long periods of time, or renders her bedridden on particularly bad days, there is no objective medical evidence to confirm or corroborate such testimony. There is also no evidence that the degenerative spurring in Plaintiff's lumbar region is severe enough to warrant such levels of pain. According to Plaintiff's medical records, she has never characterized her pain as severe or debilitating, but, rather, has always tended to characterize it as mild or moderate. See A.R. at 382, 409, 491. At the hearing, Plaintiff testified that, on a scale of one to ten, her back pain, on average, was a seven. Id. at 35. However, as the records show, Plaintiff has tended to estimate her back pain at a two or three, at most. See id. at 284, 289, 386. Furthermore, while some records indicate that Plaintiff would occasionally experience difficulty or pain with walking or standing, none of the records suggest that Plaintiff experienced severe pain while sitting.

Finally, as the ALJ noted, the only objective medical findings concerning Plaintiff's back were the limited range of motion and pain upon movement in the lumbar region. This pain may be attributable to the degenerative spurring discovered in Plaintiff's lumbar region, but there is no evidence that the underlying medical condition would cause pain or immobilization to the extent described by Plaintiff. It was reasonable for the ALJ to infer, given the record as a whole, that Plaintiff's asthma and back pain, in combination, would not give rise to the functional limitations as described by Plaintiff in her application for social security benefits or through her testimony. The ALJ's restriction of Plaintiff to sedentary work, with an option to sit at will,

properly accommodates any limitations that may arise from the combination of Plaintiff's asthma and back pain.

Plaintiff also makes a passing reference to her testimony that her medications make her drowsy.  Pl. Br. at 6.  At the hearing, Plaintiff testified that she lies down for three to four times a day, for an hour or more at a time, because of her back pain and because certain medications (Vicodin, Flexeril, and Indocin) make her drowsy.  A.R. at 34.  It is true that vocationally-limiting side effects of medications must be considered in assessing a claimant's RFC.  See SSR 96-8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication). . . . "); Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 247 (6th Cir. 2007) (noting that "side effects of any medication taken to alleviate the symptoms" is a relevant factor to consider in evaluating a claimant's symptoms).  But, here, there is insufficient evidence in the record to show that the side effects experienced by Plaintiff were so severely limiting as to preclude her from engaging in sedentary work with a sit/stand-at-will option.  On occasion, Plaintiff has complained of feeling fatigued.  A.R. at 375, 425.  However, her subsequent medical exams demonstrated that her judgment and insight were "[n]ormal for everyday activities, social activities and self awareness," and that Plaintiff was "[o]riented to time, place and person."  Id. at 379, 428.  And while Plaintiff was, at times, diagnosed with fatigue, a diagnosis, without more, does not speak to the functional limitations of that diagnosis.

In making her main argument, that the ALJ failed to consider "the practical functional effects of having [a] severe breathing condition," Pr. Br. at 6, Plaintiff relies almost exclusively on her testimony.  However, the ALJ specifically found that Plaintiff's "statements concerning

the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with [the RFC] assessment." A.R at 18. The ALJ explained that Plaintiff's "testimony is not well supported by the objective medical evidence in the record and while given appropriate consideration, it was not given significant weight." Id. The ALJ further found that Plaintiff's functional limitations "will not interfere with her ability to function independently, appropriately, effectively, and on a sustained basis." Id.

As summarized by the Sixth Circuit, the following legal standards govern an ALJ's credibility determination:

> It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. Consistency of the various pieces of information contained in the record should be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.
>
> Social Security Ruling 96-7p also requires the ALJ explain his credibility determinations in his decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.

Rogers, 486 F.3d at 247-248 (citations and footnote omitted).

Here, the ALJ made an explicit finding as to Plaintiff's credibility regarding her functional limitations. The ALJ noted that Plaintiff's testimony was not supported by the medical record and, accordingly, gave it limited weight. Notably, the ALJ did not disregard Plaintiff's testimony entirely; to the contrary, he modified Dr. Nguyen's recommendation to accommodate Plaintiff's "testimony regarding her need to take frequent rests." A.R. at 18. The ALJ thoroughly discussed evidence from the medical record and Plaintiff's testimony in his analysis of the objective basis for Plaintiff's allegations; he also specifically explained his reasons, described above, for discounting Plaintiff's credibility, in conformance with Sixth Circuit precedent and Social Security Ruling 96-7p. Accordingly, the ALJ applied the correct legal standards in rendering his credibility assessment.

Further, the ALJ's credibility assessment was supported by substantial evidence in the record. As discussed, supra, Plaintiff's medical records indicate that she becomes short of breath only upon exertion. Therefore, the evidence supports the ALJ's decision to discount Plaintiff's testimony that the nature and severity of her breathing problems prevent her from engaging in all types of work, including sedentary work that involves little to no exertion. Similarly, the objective medical evidence does not support Plaintiff's claims that her back pain limits her ability to sit for lengthy periods of time, causing her to be largely bedridden; therefore, the evidence also supports the ALJ's decision to discount Plaintiff's credibility as to the extent of Plaintiff's functional limitations stemming from her back problems.

Finally, Plaintiff's argument that the VE's testimony established that an individual who must nap multiple times a day, or who must otherwise frequently miss work, would be unable to find competitive work is not persuasive. The limitations incorporated into that particular

hypothetical posed by the ALJ to the VE were found to be not applicable in the ALJ's decision. Because the ALJ found such limitations to be not applicable, he was not bound by the VE's response to that particular hypothetical.  See Littlepage v. Chater, No. 96-6618, 1998 WL 24999, at *4 (6th Cir. Jan. 14, 1998) ("[O]ne can rely on [VE] testimony as substantial evidence only 'if the [hypothetical] question accurately portrays [the claimant's] individual physical and mental impairments.'" (alterations in original) (quoting Varley v. Sec'y of Health and Human Servs., 820 F.2d 777, 779 (6th Cir. 1987))); see also Gant v. Comm'r of Soc. Sec., 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed credible.").  As previously discussed, the ALJ's credibility assessment is reasonable in light of the medical evidence, and the ALJ's RFC determination is sufficiently supported.  Therefore, substantial evidence supports the ALJ's rejection of the limitations that prompted the VE's response to which Plaintiff now cites.

### B.  The ALJ Properly Applied the Treating-Physician Rule

Citing the treating-physician rule, Plaintiff makes a cursory argument that, "[s]ince these findings were made by several doctors and considered objective medical evidence they should not have been summarily disregarded by the ALJ."  Pl. Br. at 7.  While not addressing this argument explicitly, Defendant notes that "Dr. Nguyen was the only medical source to provide an assessment of Plaintiff's functional abilities."  Def. Br. at 9.  Defendant argues that the ALJ "accorded some weight to Dr. Nguyen's functional capacity opinion," but also incorporated a further sit/stand-at-will option to reflect Plaintiff's subjective need to take frequent rests.  Id. The Court observes that Plaintiff's reference to "these findings" is ambiguous.  It is unclear whether Plaintiff refers to the medical diagnoses that were made by her doctors, or to the alleged

limitations on activities of daily living that she submits preclude her from engaging in meaningful work.  Out of an abundance of caution, the Court will address both.

The treating-physician rule provides for the amount of deference a decision-maker must give to the opinions of the claimant's treating physician.  Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 406 (6th Cir. 2009) (ALJ must "generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians.").  The regulations define medical opinions as, "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite [the] impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  The treating source's opinion must be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Id. § 404.1527(c)(2).  If the ALJ does not give the treating physician's opinion controlling weight, the ALJ must (i) determine how much weight to assign to the opinion, and (ii) support its determination of how much weight to give with "good reasons."  See Friend v. Comm'r of Soc. Sec., 375 F. App'x 543, 550 (6th Cir. 2010); Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007).  For non-treating sources, the ALJ must "weigh[] these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling."  Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 376 (6th Cir. 2013).

To the extent Plaintiff argues that the ALJ "summarily disregarded" the medical findings of Plaintiff's treating physicians, the Court disagrees with Plaintiff's assessment.  The ALJ

26

acknowledged that Plaintiff suffered from "restrictive lung disease, NOS, possible sarcoid with elevated ACE[,] and asthma." A.R. at 17. The ALJ also concluded that "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms." Id. at 18. However, the ALJ found that Plaintiff's allegations regarding the extent and severity of the functional limitations associated with her impairments were "inconsistent with the objective medical findings in the record." Id. Therefore, it would appear that the ALJ accepted the objective findings of Plaintiff's treating physicians, and discredited Plaintiff's testimony to the extent it deviated from those objective findings.

To the extent that Plaintiff argues the ALJ disregarded her treating physicians' findings concerning her "limitations on activities of daily living," specifically that she had "too much shortness of breath, . . . trouble walking, wheezing, [and] needed to [lie] down after frequent breathing treatments," Pl. Br. at 7, the Court, again, disagrees. Plaintiff points to no record evidence that any of her treating physicians made such findings as related to Plaintiff's functional limitations. Nor can she in light of the record presented. The ALJ referenced the objective medical findings of Plaintiff's treating physicians, but referenced just one medical opinion regarding Plaintiff's functional limitations, provided by Dr. Nguyen, the state agency examiner. There were no treating source opinions of Plaintiff's specific functional limitations for the ALJ to evaluate. The ALJ did explicitly state that he gave "some weight to the opinion of Dr. Nguyen regarding [Plaintiff's] ability to perform basic work activities." A.R. at 18. The ALJ explained that while he "agree[d] with the majority of the State agency medical examiner's opinion, the [Plaintiff's] testimony regarding her need to take frequent rests supports the inclusion of a sit/stand at will option in the aforementioned [RFC]." Id. Plaintiff has not provided an explanation as to how the ALJ erred in considering the non-treating source's opinion

absent any other treating-source opinion.

Furthermore, there is no evidence in Plaintiff's treating physicians' objective findings that her impairments were so limiting as to preclude Plaintiff from engaging in meaningful, sedentary work. The medical records indicate that Plaintiff only had shortness of breath upon exertion, and that Plaintiff experienced only intermittent and occasional problems standing or walking. The RFC accurately captured those limitations, and the VE testified that an individual with those limitations would still be able to find work in the national and regional economy. Accordingly, the Court finds Plaintiff's argument without merit.

### C.  The ALJ Considered Plaintiff's Impairments in Combination

Lastly, Plaintiff contends that the ALJ failed to consider Plaintiff's two chief complaints, her pulmonary problems and her "low back radiculopathy," in combination. Pl. Br. at 7-8. Plaintiff submits that the combination of these two conditions, and the medications Plaintiff took for relief, substantiate Plaintiff's need to frequently nap throughout the day, and would explain why Plaintiff would be bedridden for at least one day a week, thereby precluding gainful employment. Id.

In response, Defendant reiterates its argument that Plaintiff has failed to supply any objective medical evidence supporting her need to take frequent naps. Def. Br. at 11. In addition, Defendant highlights that the ALJ "specifically indicated that he had considered Plaintiff's impairments in combination at step three, and relied on Dr. [Nguyen's] determination that Plaintiff did not have a combination of impairments that met or equaled any Listing." Id. at 12 (citation omitted).

The Sixth Circuit requires only that an ALJ provide some indication that he considered a claimant's impairments in combination.  Gooch v. Sec'y of Health and Hum. Servs., 833 F.2d 589 (6th Cir. 1987).  For instance, in Gooch, the Sixth Circuit held as follows:

> The ALJ's decision not to reopen Mr. Gooch's earlier application for disability benefits was made after "a thorough review of the medical evidence of record," and the fact that each element of the record was discussed individually hardly suggests that the totality of the record was not considered, particularly in view of the fact that the ALJ specifically referred to "a combination of impairments" in deciding that Mr. Gooch did not meet the "listings." It is clear that Mr. Gooch's pulmonary impairments were considered collectively, moreover, because the ALJ specifically found that these "impairments" (plural), which the ALJ characterized as "severe," did not prevent Mr. Gooch from returning to his former work.

Id. at 592.  The court went on to say that "[t]o require a more elaborate articulation of the ALJ's thought processes would not be reasonable."  Id.

Here, the ALJ explicitly addressed Plaintiff's impairments in combination in Step Three, when he found that "the impairments, or combination of impairments, do not meet or medically equal the specific criteria of 1.00 Musculoskeletal System, 14.00 Immune System Disorders, or any impairment listed in Appendix 1, subpart P, Regulations No. 4."  A.R. at 15.  In addition, the ALJ determined the RFC "[a]fter careful consideration of the entire record."  Id.  The ALJ considered Plaintiff's ability to work in light of her "back pain from arthritis and lung problems," id. at 16, and determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  Id. at 18 (emphasis added).  Finally, the ALJ stated that, although Plaintiff "has a history of many diagnoses and complaints, [] the only objective findings in the treatment notes are a decreased range of motion and tenderness in the lumbar spine and shortness of breath upon exertion."  Id.  Thus, the ALJ's decision makes clear that the ALJ considered Plaintiff's pulmonary conditions and her back pain in combination.

Accordingly, the Court rejects Plaintiff's argument that the ALJ failed to consider her pulmonary issues and back pain in combination.

## VI.   CONCLUSION

Because the ALJ's decision applies the correct legal standards and is supported by substantial evidence, the Court denies Plaintiff's motion for summary judgment (Dkt. 11) and grants Defendant's motion for summary judgment (Dkt. 20).

SO ORDERED.


s/Mark A. Goldsmith
Dated: November 14, 2014            MARK A. GOLDSMITH
    Detroit, Michigan               UNITED STATES DISTRICT JUDGE


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 14, 2014.

s/Johnetta M. Curry-Williams
JOHNETTA M. CURRY-WILLIAMS
CASE MANAGER